Yes. Mr. Beasley. Good morning, my name is Robert Beasley. I represent William Amos with respect to this matter. We seek review of two points on appeal. The first is the preclusion and prohibition by the trial court of allowing Mr. Amos to submit evidence of the fair market value of the real property foreclosed at the time of the foreclosure as permitted by Florida law. Mr. Beasley, we got a spate of these things back in the 90s, I guess after the savings and loans debacle, but this is the first dinch-doomy case I've seen in a good many years and I was beginning to think it was because the law was settled and there was not much dispute about it. But tell us what's disputed about the law. Well, there's two points on the appeal, the application, the interpretation of the short sale agreement. I'd like the court to consider the more academic one and more challenging one to discuss as the dinch-doomy doctrine and I can talk about that. Take the issues as you deem them important to you. Well, I just want to briefly touch about the short sale agreement because that one to me is the easy one and the clear one. Florida law allows a party to get a credit for the fair market value of the property on the day of the foreclosure. This foreclosure was pending. This MSJ was filed. There were no defenses. A short sale buyer comes in. There's correspondence, you'll see it at the record, at 90, that says from the borrower side, we don't care if the sale goes through or not. This relieves the FDIC of the burden of carrying this property. We just want our credit. There's a short sale agreement entered into. Paragraph 13 says Amos and Itza shall have the right to establish the credit. It then says the FDIC doesn't waive any of its rights to contest matters. The correspondence makes it very clear that this was for the FDIC's benefit. They received the burden. The trial court interpreted that agreement to bar Amos from admitting that evidence. The difference is the difference between having a judgment against you and not most likely. The short sale was 1.8. The value was in excess of $4 million. The judgment was $4 million. That issue alone relieves Mr. Amos of this judgment burden if he was just allowed to enter his credit. The problem with this, it seems to me, is there's an abuse of discretion standard about whether Amos really could offer admissible testimony on this about the fair market value. He had testified earlier in a deposition, right? I don't live here. I don't know the market. He didn't know, basically, enough to provide an opinion. It's not clear, given this record, that the district court abused its discretion in not admitting that. The interpretation of the contract would be de novo review. Then on the fourth motion in limine, the trial court did two things. One, it denied the ability of an expert, of an appraiser, to come in and give that value. Then as a backup, Mr. Amos attempted to give the value. That's the part of the fourth motion in limine that you're discussing, which is the court determined that when he testified in 2011, several years prior, and during those several years, he maintained the property. He was the sole. He was left holding the bag. He was the sole one maintaining the property and doing all those things to upkeep it and pay taxes and everything. She took his testimony from the deposition several years prior and said, you don't have enough knowledge. The Mercury Marine Division in Florida says that a corporate officer does have the standing to testify and that the threshold is very minimal to establish that knowledge. He was the only person that could have had that knowledge. We believe that that was an error. Even then, if the court interprets the short sale agreement as it should have been interpreted, then we could put an appraiser in there. The denial of that appraiser is an issue. I may have misread it. I thought the FDIC's position at least included the proposition that Amos would have had the right to assert fair market value in the event of a foreclosure, and there was no foreclosure here. Did I misread that? As if the FDIC had foreclosed is what the agreement says. Before we get to the short sale, I thought their position was even if there had been no short sale, there had to be a foreclosure to establish his right for the fair market value, and there was no foreclosure. That's right, because the short sale avoided the foreclosure. So the foreclosure was imminent. It was a few days away. So only if the short sale agreement gave them a right to fair market value credit absent a foreclosure do you win. That's the FDIC's position. I want you to respond to that. Regardless of why there was no foreclosure, there was no foreclosure, therefore no right to a fair market value offset unless the short sale agreement specifically gives you that right absent a foreclosure. Yes, Your Honor, and it does. I'm looking at paragraph 13. Where does it? Amos and Issa shall have the right to establish a credit as if the FDIC had foreclosed. No, no. Don't they say they reserve and do not waive any defenses to include any challenge to the validity of any guarantee, and shall have the right to establish a credit against the related fair market value? See, I read that, and maybe I misread it as saying they don't waive that position. Well, they don't waive the position as to the value because keep in mind there's two things at issue at this point. One, there's the ongoing Amos guarantee dispute, and two, there's what to do with the property. Buyer walks in. The correspondence makes it clear. You can let him buy this if you want. It doesn't matter to us. We just want our credit. Now, what the credit is is yet to be disputed. We anticipated that we would have a battle of appraisals, if you would, and then FDIC would put on their dollars, we'd put on our dollars, and the court would allow for that. So it's just the issue is that we get to establish that credit and not take these dollars because these dollars were insufficient, and everyone knew that, that these dollars allowed the FDIC to relieve their burden of having to maintain this property. Well, the problem is the ambiguity is penultimate sentence in that paragraph says she'll have the right. Amos shall have the right to do this, but the next sentence says FDICR disagrees with that right and reserves the right to contest it. That's correct, and if that's ambiguous. So how does that give you the right? It just simply says you dispute. If the court finds that ambiguous, I'm okay with that result because the correspondence is crystal clear. Go to the letters on July 2013 which say, FDIC, we don't care if you sell this or not. We just want our credit of fair market value as if you foreclosed. If you want to relieve yourself of owning this property. And the FDIC said we agree with that wholeheartedly and we won't argue to the contrary. And we proceeded with the sale. It was their buyer. Did the FDIC say we agree with that? We'll give you the fair market value. Don't worry about it. We're not going to dispute that. I'm sorry. Did the FDIC say in response to your letter asserting that position, yes, we agree with it? They proceeded with the sale. There's no letter back other than the agreement. The agreement follows that letter. Sure. And the agreement says the FDIC disagrees with that. So I don't see how the agreement can give you the right to fair market value outside of foreclosure context if what it says is you assert the right and the FDIC disagrees with it. They disagree with everything that Amos asserted at that point. They disagree with the contest of the guarantee. Because remember, that's in that paragraph also. They also disagree. I understand, but you've got to point to the agreement to give you the right to a fair market value offset outside of a foreclosure. And if all you can point to is we asserted the right, they disagreed with it, that doesn't give you the right. Shall have the right has to mean something. Well, what does FDICR disagrees with mean? Well, they do disagree. They do disagree with the issue of the – it doesn't matter if they disagree, if I shall have the right. They disagree with you having the right in terms of this agreement. The question is whether you were given that right by this agreement. You say you are. They say you aren't. Okay, so the suggestion then is that the FDIC counsel in preparing this agreement, rather than having an ambiguous agreement that the court needs to examine the parole evidence, rather than that, the suggestion then is that there was some trickery going on, where they say you shall have the right, but we disagree with it, and therefore we've now snatched back from you in the next sentence the right we just gave to you and agreed to in the first sentence. That did not occur. There's no suggestion of that. The better explanation is that the parties intended to be clear on this, and then later the ambiguity existed, and there was an opportunity to argue the other way. But the parole evidence does not support any of that. There's another ground, though, for the district court to be affirmed, and that is that all you offered was Amos' testimony, and the district court said it was incompetent evidence, and it was excluded on that basis. The standard of review for that is abuse of discretion. I know you've got this stuff. You argued that under Florida law, a corporate representative could testify to this. I'm not sure why that has anything to do under Erie with the way we do things in federal court. It seems to me this is a matter governed by the federal rules of evidence. This would be lay testimony, and you've got deposition testimony that says he doesn't know enough. It's two parts. One is the appraiser was excluded also, and so you're focused on the Mr. Amos qualifications issue, and that may be abuse of discretion, but the appraiser certainly would have been qualified. The appraiser just wasn't allowed. And so the Amos position was a backup to the appraiser who was excluded. The appraiser was excluded because of the interpretation of the agreement. If I could get briefly to Dentsch-Dumy, let me make three points in my minute. One, there was no pleading of Dentsch-Dumy. The only pleading of affirmative offense was 1823E, the statute. The case law was clear that the Dentsch-Dumy doctrine is broader. The analysis may be the same. They're interchangeable, and you don't separate them out. The analysis is interchangeable, but in Gulf Life Insurance, this court said that it doesn't cover, 1823 doesn't cover estoppel, enrichment, and unclean hands. It certainly doesn't cover the lack of corporate authority argument. Lack of corporate authority under Florida law makes the instruments void, not voidable. The individual did not have the corporate authority. All the resolutions that would indicate such were blank. That was an affirmative defense that is not covered. within the documents of the bank or otherwise. So if this individual did not have the corporate authority, and it's undisputed that he didn't, then those instruments are void, not voidable. It has to be reflected on the books of the bank that he did not have the authority, not that it's silent as to whether he had the authority. The defenses, the conditions have to be reflected on the book. That's pure purpose of Dentsch-Dumy. The examiners have got to be able to look at the books. They're locked in the bank. They have no hope of going outside until they reach a decision. They look at the books, and if the books show them a defense or a condition, not the absence of the absence of a defense or condition, but that there is a defense or condition, then you're entitled to assert it. But if the books don't show them that under Dentsch-Dumy as it's evolved, you lose. And on that point, if you could please look at the credit approval request at 278-14. It is a document in the records of the bank at the time of the loan approval. It's signed by the president and the other loan officer. It reflects the loan approval, and it is completely false and fraudulent. It is completely false and fraudulent. It is a document, and it was noted by the examiners. That's fraudulent inducement. No, it is false. It contains false evidence. That's what fraud is. It's false. And fraud defenses don't survive Dentsch-Dumy unless it's as to the even existence of an agreement. If the person didn't even know they were signing an agreement, the classic deal is you thought it was a money market agreement. It turns out to be a promissory note. And in this agreement, he signed a guarantee that was blank, related to terms that he was not even aware of. He didn't even know the loan had happened at the time. He thought there was another guarantor. The bank document signed by the bank says there was another guarantor. So the examiners had all of this information. They noted it in their reports in 08 and 09 and 10. It was in the 2012 investigation. They indicted these people, and they went to jail for it. The FBI identified Mr. Amos as a victim. So if the whole purpose of this is to protect the examiners and what they know, they knew. They knew. They proceeded on it. They prosecuted it. I will reserve the rest of my time. Mr. Beasley, I'm looking at Judge Rogers' order on this motion in limine. And she says that ITSA and Amos have no expert and no appraisal from the date of the short sale. And then the only thing she addresses is whether Amos can testify about this. What am I missing? There was an expert. It must have been excluded in another motion in limine. There were several motions in limine. But there was an expert provided by Amos to testify as to the matter. And I'll find that in the record, Your Honor. I mean, we had an appraisal. We had an expert. This says that it wasn't one. Maybe I'm missing something. But go ahead. Thank you. Thank you. Mr. Watson. May it please the Court, I'm Scott Watson. I'm here today on behalf of the FDIC as the receiver for the failed Gulf South Private Bank. And I will, because I agree with the proposition that Section 1823E and the Dench-Dumey Doctrine are largely settled law, and the contours are very well known in this circuit and elsewhere, I'll focus on this second issue and then briefly return to Section 1823E. As to fair market value, I'll go right to that last question that you posed, Your Honor, and that is that Mr. Amos proposed after the entry of summary judgment and prior to this trial on damages alone, untimely proposed an expert witness, an appraisal. And they were barred by the district judge as untimely and having provided no excuse for the failure to meet the timeliness. Mr. Amos then proceeded to oppose the FDIC's motion in Lemonet regarding his lay testimony. And I'd like to focus, if I can, on the untimeliness issue. That can't be an abuse of discretion. It's not an abuse of discretion. It's also not appealed. The reason it came as a surprise to the court, I think, is that it's really not laid out in the briefs. But it was not an abuse of discretion. It was untimely, and the district judge did enter an order. And I'm sorry I don't have the order number at my fingertips. But it is there. And that's why Mr. Amos turned to lay testimony. And before we turn to the issue of the contract, which we believe the district court properly found facially demonstrates that there was no meeting of the minds as to any additional contract rights conferred on Mr. Amos or on ITSA. But at a fundamental level of the exercise of discretion of the district judge, here's what we had. The FDIC came in with a motion in Lemonet, and it described why lay testimony wasn't available. It acknowledged that in certain circumstances a corporate representative might have authority. Actually, that was raised by Mr. Amos. But it pointed directly to Mr. Amos' deposition testimony in which he said, I don't know the value, I don't know the market. That was the motion in Lemonet. In opposition, Mr. Amos came back, pointed to the right of a corporate representative, if that corporate representative had knowledge of the property values, experience with the property, knowledge of the market and the property, might have a right to testify as to value. That's a Florida evidentiary rule, right? It's a Florida evidentiary rule, and a careful parsing of Mr. Amos' request shows that he never overcame the FDIC's evidence that he didn't know anything. The actual document that Mr. Amos filed in response, Docket 418, he presented the same deposition testimony. So he quoted his own testimony that he didn't know anything and then added why that's four years old. And in the meantime, Mr. Amos has wound down the company. Quote, this is an indication Amos may be familiar with property and values on that sale date. He also added the FDIC ignores the possibility that Amos had the time, inclination, and provocation to understand the markets and then offered nothing. Not only is there no evidence, no deposition testimony, no attached affidavit, no proffer, but there's never even an assertion on the part of Mr. Amos that he had any knowledge of the property. So it just, we contend, couldn't have been an abuse of discretion for the trial judge who noted all of this in her order granting the motion in limine. It couldn't have been an abuse of discretion to say Mr. Amos has given me nothing. Indeed, he pointed me to his earlier testimony that he lacked knowledge. And so on that basis alone, it was a proper exercise of discretion, and the court could end there. But we do want to just stress that a provision in the short sale agreement that said a reservation of existing rights shouldn't be construed to then confer rights when Mr. Amos listed a statement of what he thought he could assert, and the FDIC said we disagree with that assertion and we will raise every legal objection available to us. There was no meeting of the minds. I also think that just for purposes of clarity, Mr. Amos' counsel, my friend, said that they didn't care. They just wanted a credit. The record actually shows that Mr. Amos was strongly urging and essentially pleaded with the FDIC to enter in this short sale to avoid a foreclosure sale. It's Mr. Amos who wanted to avoid foreclosure on behalf of himself as guarantor, and it's a— Would you think like to me the easiest way to resolve this issue was just to say even if he could offer the evidence, he just didn't have any? We believe that that's correct, Your Honor, and the district court did not abuse its discretion in doing so. His argument about Amos' deposition testimony, he didn't know the market, he didn't know what the fair value was, that was given five years before the trial and two years before the date of the short sale. That's correct, Your Honor, and we acknowledge that. But in pointing to that testimony in a motion in Lemonet where the district judge was being asked whether to exclude lay testimony as to value of property, and he was not even the owner. He was purportedly a corporate representative of ITSA. For him to then come forward and say, you know, they're right, or look, four years have passed. Why, that was old information. Mr. Amos may have had the opportunity to learn something. He wound down the corporation. That's not even an argument that he knew anything, much less a proffer or— They didn't put in any affidavit from him or anything like that. None whatsoever, and the district judge noted that explicitly in her opinion. And as to Section 1823E and the Dentsch Doctrine, we do believe that they're settled. Mr. Amos has raised five purported reasons not to apply the statute by its terms. None of them has any validity. I won't belabor the point, but the Langley decision made clear as your exchange, Your Honor, with Mr. Amos' counsel suggested that conditions to an obligation must be reflected in a writing that satisfies Section 1823E. You can't have other understandings that would vary the facial terms of an obligation. They have to be in an instrument that satisfies Section 1823E. Langley also explained that the equities favor the FDIC in that case. Mr. Amos had an opportunity to write down in his guarantee exactly what he was predicating his guarantee on. And he said, I unconditionally and absolutely guarantee every obligation of ITSA to this bank, past and future, indirect or direct, implied or explicit. That's all on the face of the guarantee that Mr. Amos signed. So these conditions that he now asserts should somehow excuse him from that absolute unconditional promise to pay don't meet Section 1823E and they're barred. The Gordy decision in this court explained that that also includes a guarantee just as the obligation in Langley, which was a note. So the notion that there's no agreement here implicated for purposes of 1823E is barred by Langley and by this court's decision in Gordy and subsequent decisions. That Gordy decision also made clear that even a high degree of fraudulent inducement, a very high degree of fraudulent inducement, simply doesn't equate to fraud in the factum where you lack the knowledge of the terms of the agreement. You raised the classic example of a money market versus a promissory note that somebody hid the terms of the document and got them to sign. The Gordy case also discussed an alteration in forgery as a case where no asset came into existence. There's nothing like that here. Mr. Amos asserted at docket 47 in his answer and counterclaim that he agreed to invest in reliance on fraudulent representations. Amos would not have executed the guarantee but for the fraudulent misrepresentations and omissions of Wright and Gulf South. That's a direct quote from paragraph 35 of that document. His deposition said the same thing. He knew he was signing a guarantee. He knew the guarantee was being used to obtain a loan. At page 122 of that deposition, which is docket 226, yes, that's my signature, page 132. You knew it was a guarantee when you signed it, guaranteeing a loan of some amount made by Gulf South? Yes, I knew that we were going to get a loan. And he consistently argued that it was signed under, quote, a false understanding. At docket 278 and docket 360, he again made those arguments. He also can't escape liability arguing that there's no authority. As you pointed out, the demonstration of what the authority was should be contained in a document that satisfies section 1823E. It's also undisputed that Mr. Amos had the personal authority to personally guarantee each and every indebtedness of ITSA. So there's no question about the authority on the guarantee. And the only issue on appeal and the only order appealed from here is the order of obligation on the guarantee. And that guaranteed a liability on the part of ITSA. That liability is in an amount certain. It's already been entered as a final judgment. That final judgment has never been appealed. ITSA is not an appellant here. Mr. Amos has an obligation on the guarantee on that indebtedness of ITSA. And as the district court found, Mr. Amos was aware that the loan on the face of the guarantee was being entered into by ITSA as a borrower. He was aware that his guarantee was security for this particular loan. And his understanding that the terms of the loan should have been different or that he had certain agreements with Mr. Wright, those don't change the nature of the unconditional guarantee. And indeed, as we explained in our brief, by signing that unconditional guarantee that noted that loan number, aware that Mr. Wright was seeking a loan at the time, he can't now argue that Mr. Wright didn't have authority. He indeed lent himself to the arrangement that would tend to mislead bank examiners as to Mr. Wright's authority. Finally, his authority for the notion that that lack of corporate authority renders the instrument void. He offers only one case, the Radisson case, and it simply doesn't stand for that proposition. Radisson dealt with a statute on mortgages alone, not on the promissory note, but on the requirements for binding a corporate entity on mortgages. And the court in Radisson focused on the absence of actual authority and the absence of apparent authority. That's not present here. Indeed, Mr. Amos lent himself to Mr. Wright's apparent authority by entering into an absolute and unconditional guarantee of the loan at that time. If there are no further questions, we urge the court to affirm the judgment below. Thank you. Thank you. Mr. Beasley, three minutes. The issue on the guarantee is whether or not there was an understanding of the nature and content of the instrument. Now, this guarantee was blank. This guarantee was executed after the loan was entered into by Mr. Wright and without the knowledge that— At his request it was after, right? At his request. The reason the guarantee wasn't entered into at the same time was your client was traveling and said, can I do it when I get back, wasn't that it? The key difference of this whole thing is exactly that. The difference whether a loan had occurred or a loan was to occur. The fact is that Mr. Amos anticipated, and that's what he said, was I'm traveling, I'll get to it when I get back. It was a promise to guarantee, which he fulfilled when he returned. He fulfilled when he returned in anticipation of the loan that did not occur the way that he anticipated it to occur. The loan that— What I'm suggesting to you is he contractually agreed to guarantee that loan when he got back, and when he got back he fulfilled his contractual duty to guarantee it. So the fact that it was three days after the loan is at no moment. The three days, there's a case that says two months is good enough if you're intending to guarantee the loan. That's not the issue. The issue is what the loan was and for and that it had occurred. Mr. Amos anticipated a loan for development to occur instead of, I'm going to sign this guarantee for a loan that has already occurred to pay off your false— If that was a condition of his guarantee, it should have been stated in the guarantee. That's what densitum is all about. Well, it should have been, and the credit approval request that's there in the bank document signed by the bank provides those terms. It provides there be another guarantor in which there was not. That information was available to the examiners when they reviewed it. There was adequate information in this file for the examiners to understand that this issue was an issue of fraud. Mr. Amos, when he signed that guarantee, had a great deal of understandings, none of which were correct about the instrument he was signing. Is it your position that any time anybody signs an obligation, instrument, contract, or whatever, if it's fraudulently induced, that's an exception to densitum? No, in fact, the case was very clear that fraudulent inducement is within the term of agreement. I believe that's a Scalia decision. No, the issue is whether or not there's a fraud in factum, whether it goes to the nature of the agreement that they signed, which is easy— By definition, if the densitum doctrines demean anything, the nature of the agreement can't include that there was no fraud in the inducement to sign the agreement. If fraud in the inducement to sign the agreement operates to absolve your client, then it would operate to absolve everyone who signed a promissory note, a guarantee, or anything else, and it wouldn't be on the books of the bank. I guess my position is that in this case, one involves a guarantee and not a note like the others. There's nothing in the note itself. And in this case, the credit memorandum that is signed by the bank, is approved by the committee, is false in exactly the way that Amos is claiming he was induced by fraud. The fraud is evident in the file of the bank. Thank you, Your Honor. Okay, thank you. We'll take that case under submission. We'll go ahead.